**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**ALLSTATE INSURANCE COMPANY**,

        Plaintiff/Counterdefendant,

v.                                    No. Civ. **04-1285 MCA/WPL**

**FORD MOTOR CREDIT COMPANY**,

        Defendant/Counterclaimant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter is before the Court on Plaintiff Allstate Insurance Company's ("Allstate")

*Motion for Summary Judgment* (Doc. No. 29) and Defendant Ford Motor Credit Company's

("FMCC") *Motion for Partial Summary Judgment* (Doc. No. 34).  Having considered the

parties' submissions, the relevant law, and otherwise being fully advised in the premises, the

Court determines that Plaintiff is entitled to summary judgment on Count 1 of its complaint

for declaratory relief.  Therefore, Allstate's motion is granted and FMCC's motion is denied

for the reasons set forth below.

**I.**        **<u>BACKGROUND</u>**

The following facts are either undisputed or are those that most favor the party

opposing summary judgment, in this case, Defendant FMCC.[1]

---

[1]This Court has considered the facts in light of Allstate's motion for summary judgment. The Court's decision to grant Allstate's motion is necessarily dispositive of FMCC's motion for partial summary judgment, so there is no need to construe the facts in a separate light when considering FMCC's motion.

FMCC leased two pickup trucks to Marquez Surveying Company, Inc. ("Marquez Surveying") under a commercial lease, including a 2000 F-250 truck ("F-250"). Initial Pre-Trial Report ("IPTR") (Doc. 18), Stipulation 1. Marquez Surveying purchased a business auto policy (the "Policy"), No. 050399739, from Allstate, which was in effect for the period from June 24, 2002, to June 24, 2003. The Policy provided coverage for "leased autos," including the F-250. The applicable liability limit under the Policy was $1 million. IPTR, Stipulations 1-2; Pl.'s Mot., Undisputed Material Fact 2; Def.'s Resp. at 1.

The Policy also contained an endorsement entitled "Lessor – Additional Insured and Loss Payee" that identified FMCC as an "Additional Insured (Lessor)" for the F-250. The relevant provision of the endorsement stated as follows:

A.  Coverage

1.  Any "leased auto" designated or described in the Schedule or in the Declarations will be considered a covered "auto" you own and not a covered "auto" you hire or borrow. For a covered "auto" that is a "leased auto" **Who Is An Insured** is changed to include as an "insured" the lessor named in the Schedule.

2.  The coverages provided under this endorsement apply to any "leased auto" described in the Schedule until the expiration date shown in the Schedule, or when the lessor or his or her agent takes possession of the "leased auto", whichever occurs first.

Pl.'s Mot., Undisputed Material Facts 4-5.

In October 1999, FMCC entered into an "Independent Contractor Agreement" ("ICA") with Great Western Recovery ("GWR") whereby GWR was to perform repossessions that FMCC referred to it. Def.'s Resp., Ex. 4A. The ICA referred to GWR

2

as "an independent contractor." *Id.*, Ex. 4A at ¶ 1(j), 9(j). In addition, among other things, the ICA provided that GWR was to have insurance that protected against liability arising from its repossession work and that FMCC was to be named as an additional insured under GWR's insurance policy. *See id.*, Ex. 4A at ¶ 4. The ICA further provided that GWR was to defend all claims related to FMCC's, GWR's, or a subcontractor's performance or obligations under the agreement. GWR was also to indemnify FMCC for expenses incurred by FMCC in connection with any such claims. *See id.*, Ex. 4A at ¶ 6(a). Furthermore, the ICA provided that GWR "may delegate its duties under this Agreement to subcontractors provided, however," that GWR use only subcontractors that obtained all licenses and bonds required by law, that maintained the insurance as required in the agreement, and that entered into an independent contractor agreement with FMCC. *Id.*, Ex. 4A at ¶ 5. The ICA could be terminated by any party by providing oral or written notice of termination, and the ICA would terminate immediately upon receipt of such notice to the other party. *Id.*, Ex. 4A at ¶ 8.

The Marquez Surveying account became delinquent and FMCC sought to recover the F-250 by repossession. Pl.'s Mot., Undisputed Material Fact 6. In February 2002, FMCC assigned the Marquez Surveying account to GWR for repossession. *Id.*, Undisputed Material Fact 7. On July 10, 2002, counsel for FMCC sent GWR a letter in which counsel noted, "We have been advised of the termination of Great Western Recovery, Inc.'s contract with our clients." Pl.'s Reply, Ex. A. Nevertheless, on July 18, 2002, despite that GWR was no longer an approved contractor, FMCC reassigned the Marquez Surveying repossession to

GWR with instructions, "Bankruptcy dismissed.  Repo on sight."  Pl.'s Mot., Undisputed Material Fact  8, Ex. 1, and Ex. 2 at 33.

At the time of the reassignment, GWR had a service agreement with Dennis Seibert ("Seibert") in which GWR would assign repossessions in the Albuquerque, New Mexico area to him.  *See* Def.'s Resp., Ex. 1 at 8, Depo. Ex. 15.  GWR considered Seibert's business address to be the Albuquerque office of GWR.  *See id.*, Ex. 2 at 19.  GWR informed FMCC employees that GWR had an Albuquerque office and that Seibert ran the office.  Pl.'s Mot., Ex. 3 at 50.[2]  All of GWR's repossessions in the Albuquerque area were assigned to Seibert. *Id.*, Undisputed Material Fact 9.[3]  GWR paid Seibert on a per-repossession basis.  The service agreement described Seibert as both a contractor and an agent.  Def.'s Resp., Ex.1, Depo. Ex. 15 at 1-2 ("GWR will assign all recovery work in the area agreed to the contractor and will pay contractor baced [sic] on the following pay scale. . . . You will be our agent on every assignment in your area.").  Seibert considered himself a contract worker for GWR. *Id.*, Ex. 1 at 29.  According to the service agreement, however, Seibert had the authority to use GWR's name as his own and, when Seibert and his employees were working GWR accounts, they were GWR.  *Id.*, Ex. 1, Depo. Ex. 15 at 2.  The agreement also stated that the

---

[2]FMCC does not dispute that GWR made this representation; however, FMCC contends that GWR's representation was false.  Def.'s Reply in Supp. of Mot. for Partial Summ. J. (Doc. No. 43) at 3.

[3]FMCC does dispute one aspect of ¶ 9 of Allstate's Undisputed Material Facts:  Allstate's characterization that GWR's assignments were "serviced by the Albuquerque office operated by Dennis Seibert."  FMCC, however, does not dispute the portion of ¶ 9 that alleges that GWR assigned all of its Albuquerque repossessions to Seibert.  *See* Def.'s Resp. at 1-2.

"home office" of GWR was to send Seibert assignments and Seibert was to report back to the "home office." *Id.*, Ex. 1, Depo. Ex. 15 at 2. Seibert had authority to speak on behalf of GWR and communicate directly with clients, including FMCC, regarding repossessions. Pl.'s Mot., Undisputed Material Fact 11. Seibert conducted many repossessions on behalf of FMCC in the Albuquerque area. *See id.*, Ex. 4 at 44, 47. Seibert estimated that he conducted approximately eight repossessions per week for FMCC from the time GWR started getting FMCC assignments. *Id.*, Ex. 4 at 40.

Not one of Seibert's businesses ever held its own repossessor's licence. Def.'s Resp., Ex. 1 at 37. The service agreement between GWR and Seibert, however, provided that Seibert's repossession business would be working under GWR's license as "Great Western Recovery, Albuquerque Branch." *Id.*, Ex. 1, Depo. Ex. 15 at 2. Under the service agreement, GWR provided Seibert with GWR's name, license, bond, business and liability insurance for repossession services, repossession training as needed, client base, computer hardware, computer programs, computer training, and a legal defense, if necessary. *Id.*, Ex. 1, Depo. Ex. 15 at 1. According to the position of the Financial Institutions Division of the New Mexico Regulation and Licensing Department, however, Seibert should have been separately licensed since he reported his compensation for tax purposes on a Form 1099. *See id.*, Ex. 2 at 22-23 and Ex. 3.

In addition to conducting contract repossession work for GWR, Seibert was self-employed and operated several businesses, including Southwestern Salvage, a car crushing business, and Seibert and Company, an auctioneering company. *See id.*, Ex. 1 at 10-11, 29.

Seibert had two contract workers for Southwestern Salvage, Carl Coffman ("Coffman") and James Killingsworth. *Id.* at 17-18. Coffman also did repossession work for Seibert as part of GWR. *See* Pl.'s Resp. in Opp. to Def.'s Mot. for Partial Summ. J. (Doc. No. 42), Ex. B at 19-20.

After receiving the Marquez Surveying repossession reassignment from FMCC, GWR assigned the Marquez Surveying repossession to Seibert. Pl.'s Mot., Ex. 4 at 75. On August 9, 2002, Coffman, per Seibert's office's request, went to Marquez Surveying's property to attempt to repossess the F-250. *See* Pl.'s Mot., Undisputed Material Fact 14; Def.'s Mot. for Partial Summ. J. (Doc. No. 34), Ex. 1 at 1-2. Coffman was concerned and frightened because John Marquez had previously threatened to shoot him when Coffman had attempted to repossess the vehicle in February 2002. Def.'s Mot. for Partial Summ. J., Undisputed Material Fact 7 and Ex. 1 at 1. Coffman opened and started the F-250 and began driving the truck off the premises. As Coffman was trying to escape from the property in the F-250, Coffman struck John Marquez and left the scene. *See* Def.'s Mot. for Partial Summ. J., Undisputed Material Facts 8-9 and Ex. 1 at 2-3. The collision occurred a matter of seconds after Coffman got into the truck. Def.'s Mot. for Partial Summ. J., Undisputed Material Fact 9. The location of the collision was on the premises of Marquez Surveying Co.'s property. *Id.* After repossessing the truck, Coffman drove the truck to Seibert's storage facility. *Id.*, Undisputed Material Fact 10. The collision killed John Marquez. IPTR, Stipulation 3. The Bernalillo County Sheriff's Department seized the F-250 during the course of its investigation into John Marquez's death. Compl. (Doc. No. 1) ¶ 20; Def.'s Answer (Doc.

No. 5) ¶ 16; Def.'s Mot. for Partial Summ. J., Undisputed Material Fact 10.

On January 15, 2004, FMCC made a written demand on Allstate to pay FMCC, as an additional insured, for the loss of the F-250 on the ground that law enforcement had seized the F-250 for use as evidence in a criminal prosecution of Coffman and had refused to return the vehicle to FMCC. Counterclaim ¶ 14; Pl.'s Answer ¶ 7. FMCC claimed that it was entitled to "loss of use" coverage under the Policy issued to Marquez Surveying. Compl. ¶ 21; Def.'s Answer ¶ 16. Allstate paid FMCC $21,058.35 for its loss of use claim. Compl. ¶ 22; Def.'s Answer ¶ 17.

Following John Marquez's death, Denise Marquez, the personal representative of John Marquez's estate, and Donna Ortiz, the mother of John Marquez's minor children, filed suit against FMCC, GWR, Don Determan,[4] Carl Coffman, and Dennis Seibert in the 13th Judicial District Court of New Mexico in a case styled *Marquez, et al. v. Ford Motor Credit Company, et al.*, No. D1333-CV2002-0214. *See* IPTR, Stipulation 5; Compl. ¶ 5 and Ex. A; Answer ¶ 2. In the *Marquez* lawsuit, the plaintiffs alleged various claims arising from the alleged wrongful death of John Marquez. *Id.* On August 11, 2004, FMCC demanded that Allstate participate in the defense of FMCC in the *Marquez* action and indemnify FMCC from any judgment or settlement in the case. IPTR, Stipulation 6. On August 12, 2004, the state court in *Marquez* filed an Order providing that FMCC "had a non-delegable duty to repossess its collateral without breaching the peace." Pl.'s Resp., Undisputed Fact 16.

---

[4]Don Determan is affiliated with GWR. *See* Def.'s Resp., Ex. 2.

7

Thereafter, Allstate sent FMCC a letter advising that Allstate's investigation to date indicated that it did not have a duty either to defend or indemnify FMCC for any of the claims in the *Marquez* lawsuit because Allstate believed that the coverage provided to FMCC as lessor and additional insured terminated when Coffman repossessed the leased vehicle.   IPTR, Stipulation 7 .  In November 2004, the parties in the *Marquez* lawsuit settled the case in mediation.  *Id.*, Stipulation 8.

On November 12, 2004, Allstate filed suit against FMCC, seeking a declaratory judgment that Allstate does not have a duty to defend or indemnify FMCC for the claims asserted in the *Marquez* lawsuit.  Compl. at 4.  Allstate also seeks repayment of sums paid to FMCC allegedly in error under the Policy.  *Id.* at 5.  On December 6, 2004, FMCC filed their Answer and Counterclaim.  (Doc. No. 5).  FMCC alleges in their counterclaim that Allstate wrongfully denied coverage in bad faith and seeks, among other things, indemnification for expenses paid in defense of the *Marquez* action and additional damages for Allstate's alleged bad faith in refusing to provide coverage under the Policy.  *Id.* at 7.

On May 2, 2005, Allstate filed a motion for summary judgment, asking this Court to declare that Allstate does not owe FMCC a defense or indemnity for the claims asserted against FMCC in the *Marquez* lawsuit.  (Doc. No. 30).  FMCC filed a response to this motion (Doc. No. 33), and Allstate in turn filed a reply (Doc. No. 37).  Additionally, on June 1, 2005, FMCC filed a Motion for Partial Summary Judgment on that portion of its counterclaim that requested a declaratory judgment that Allstate had a duty to defend and indemnify FMCC in the *Marquez* action.  (Doc. No. 34).  Allstate then filed a response (Doc.

8

No. 42), FMCC filed a reply (Doc. No. 43), FMCC filed a supplemental brief (Doc. No. 72), and Allstate filed a supplemental response brief (Doc. No. 74).

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted). Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Id.* at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.*; *Kaus v. Standard Ins. Co.*, 985 F.Supp. 1277, 1281 (D. Kan. 1997) (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986)).  There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *See Anderson*, 477 U.S. at 248.  The Court will consider Allstate's motion in light of these standards.

## III.   DISCUSSION

The policy provision at issue here excludes coverage "when the lessor or his or her agent takes possession of the 'leased auto.'"  Allstate argues that it is entitled to summary judgment for three reasons:  (1) the Policy unambiguously states that coverage for FMCC, the lessor, terminated when FMCC or its agent took possession of the F-250; (2) in repossessing the vehicle, Coffman and GWR were acting on behalf of FMCC, and were thus its agents as that term is used in the Policy; and (3) Coffman obtained possession and control of the F-250 during the course of repossessing the truck.  FMCC contends, however, that the relevant provision in the Policy is ambiguous; that Coffman and GWR were independent contractors, not agents; and that Coffman did not possess the F-250 prior to the accident because the accident occurred on Marquez Surveying's private property only seconds after Coffman began driving the vehicle.  This Court will consider these arguments in turn.

### A.   Coffman's actions were tantamount to FMCC's actions for purposes of the exclusion provision

NMSA § 55-9-609(a) provides that, after default, a secured party "may take possession of the collateral."  In taking possession of the collateral, a secured party may proceed "without judicial process, if it proceeds without breach of the peace."  NMSA § 55-9-609(b)(2).  The Official Comment to § 55-9-609(b) states that courts, in considering

10

whether a secured party has engaged in breach of the peace, should hold the secured party responsible for the actions of others taken on the secured party's behalf, including independent contractors engaged by the secured party to repossess the property. *Id.*, Official Comment 3.   According to this provision, only the secured creditor has a right to repossession.   Moreover, according to the official comment, the secured creditor cannot absolve itself of liability stemming from a repossession conducted by any person acting on behalf of the secured creditor.   It is for this reason that the state court in the *Marquez* suit found that FMCC, even though it may have assigned the repossession to an independent contractor, had a non-delegable duty to repossess the F-250 without breaching the peace. The court in *Reliance Insurance Company v. Wiggins*, 763 So.2d 450, 453-54 (Fla. Dist. Ct. App. 2000), relied on the non-delegable duty doctrine in determining that an independent contractor's actions on behalf of a creditor were tantamount to the creditor's, and thus, concluded that the independent contractor was the creditor for purposes of applying a policy exclusion.

In *Reliance*, a lessor leased a vehicle to a lessee.   The lease provided that the lessee was to obtain insurance for the vehicle and that the lessor could take possession of the vehicle upon termination of the lease.   *Id.* at 451-52.   The lessor also entered into an insurance policy with Reliance Insurance Co. ("Reliance") that provided coverage for the leased vehicle should the insurance required by the lease agreement not be collectible.   *Id.* at 452.   The policy, however, contained a termination provision that stated, "[c]overage under this endorsement ceases the date you regain custody of the leased auto."   *Id.*   The

11

lessor was the only insured under the policy, and thus, the reference to "you" was to the lessor. *Id.* When the lessee defaulted on his lease payments, the lessor hired an independent contractor to repossess the vehicle. *Id.* The independent contractor repossessed the vehicle, but approximately seven hours after taking the vehicle and after having lunch at his mother's house, the independent contractor collided with another vehicle and died. *Id.* The driver of the other vehicle sued the lessor, among others, and the lessor in turn filed a third party complaint against Reliance for a declaratory judgment and breach of contract based on Reliance's failure to provide coverage or a defense to the lawsuit. *Id.* After the district court ruled that the lessor was entitled to coverage, Reliance appealed, arguing that the lessor regained custody of the vehicle within the meaning of the policy exclusion when the independent contractor repossessed it. *Id.*

The appellate court reversed. *Id.* at 454. In holding that the lessor regained custody of the vehicle when the independent contractor repossessed it, the court determined that the actions of the independent contractor were indistinguishable from those of the lessor. *See id.* at 453-54. Although the policy stated that coverage terminated when the lessor regained custody of the vehicle, the court concluded that the independent contractor's custody of the vehicle "was tantamount to [the lessor's]." *Id.* at 453. The court thus found that the independent contractor, in acting to repossess the vehicle on the lessor's behalf, acted as the lessor for purposes of the insurance policy. *See id.* As further support for this conclusion, the court noted that a creditor's duty to repossess a car without a breach of the peace was a non-delegable duty, such that a creditor could not avoid liability by hiring an independent

12

contractor to perform the repossession.  *Id.* at 454.

This Court finds the reasoning in *Reliance* persuasive and applies the same analysis here.  In this case, by statute, Coffman could not legally take possession of the F-250 unless he was acting on behalf of FMCC, the secured creditor.  It is undisputed that FMCC assigned the repossession to GWR.  GWR had a written agreement with Seibert to repossess vehicles in Albuquerque as "Great Western Recovery, Albuquerque Branch."  Seibert acted under GWR's name, license, and insurance.  GWR considered Seibert's office to be GWR's Albuquerque office.  Although Seibert considered himself a contract worker of GWR's, the agreement referred to him as both a "contractor" and "agent."  It is also undisputed that FMCC knew that Seibert did GWR's repossession work in Albuquerque on FMCC's behalf.  Accordingly, in assigning the Albuquerque repossession to GWR, FMCC implicitly assigned the repossession to Seibert.  Under these facts, Seibert was GWR in Albuquerque, and thus, GWR's and Seibert's actions were "tantamount" to FMCC's.

In an effort to accomplish the repossession on behalf of FMCC, Seibert sent Coffman, who he considered his contract worker, to accomplish the repossession.  Coffman, like Seibert, also acted as GWR in performing repossessions for GWR on behalf of the creditors.  Coffman, working for Seibert out of GWR's Albuquerque office, worked under GWR's name, license, and insurance.  Neither GWR, Seibert, or Coffman claimed a security interest in the F-250.  It is undisputed that Coffman was conducting the repossession on behalf of FMCC.  For these reasons, the state court concluded that FMCC had a non-delegable duty to repossess the vehicle without a breach of the peace.  As in *Reliance*, Coffman's actions

in attempting to repossess the vehicle were "tantamount" to FMCC's.  *Cf. Reliance*, 763 So.2d at 453-54.   Accordingly, Coffman's actions constitute those of FMCC, the lessor, for purposes of the exclusion provision in the policy.  *See id.* at 453-54.

**B.   Coffman was FMCC's "agent"**

Moreover, even if Coffman were not acting as FMCC itself, Coffman was acting as an "agent" for FMCC as that term is used in the insurance contract.  Allstate contends that the term "agent" as used in the Policy unambiguously denotes a person who acts on behalf of another.  Allstate thus contends that the term "agent" in the policy includes both agents and independent contractors.  FMCC, relying on the Restatement (Second) of Agency, counters that the terms "agent" and "independent contractor" are distinct and have different legal consequences such that it is ambiguous as to whether the term "agent" encompasses an independent contractor.  FMCC argues that the ambiguity should be construed in favor of FMCC, the insured.

Insurance contracts are to be construed in the same manner as other contracts. *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 18, 123 N.M. 752.  Exclusion clauses in insurance contracts are to be narrowly construed.  *Risk Management Div. v. Farmers Ins. Co. of Arizona*, 2003-NMCA-095, ¶ 11, 134 N.M. 188, 192.  Ambiguities can arise in interpreting a contract in a variety of circumstances, including when the language of a provision is susceptible to more than one meaning.  *Rummel*, 1997-NMSC-041, ¶ 19, 123 N.M. 752.  An ambiguity, though not apparent on the face of a policy, can arise when otherwise clear policy language appears ambiguous upon application to a particular

14

circumstance. *Risk Management*, 2003-NMCA-095, ¶ 8, 134 N.M. 188, 191. Determining whether a policy is reasonably susceptible to different interpretations is a question of law. *Berry v. Federal Kemper Life Assur. Co.*, 2002-NMCA-116, ¶ 60, 136 N.M. 454; *Rummel*, 1997-NMSC-041, ¶ 19, 123 N.M. 752. Nevertheless, an "ambiguity is not established simply because the parties disagree on the proper interpretation." *Berry*, 2002-NMCA-116, ¶ 60, 136 N.M. 454. Nor is a policy ambiguous merely because a term is not fully defined in the contract. *Security Mut. Cas. Co. v. O'Brien*, 99 N.M. 638, 641, 662 P.2d 639, 642 (1983). Rather, "[r]easonableness is the touchstone for determining whether there is a true lack of clarity." *Berry*, 2002-NMCA-116, ¶ 60, 136 N.M. 454.

To determine whether a provision is reasonably subject to competing interpretations, the court should ask what a reasonably intelligent, non-lawyer lay person might understand the policy to mean, in light of the usual and natural meaning of words and the circumstances prior to and in making the policy. *Berry*, 2002-NMCA-116, ¶ 61, 136 N.M. 454; *Rummel*, 1997-NMSC-041, ¶ 19, 123 N.M. 752. In construing policy language, the language must be construed in the context in which it was used. *O'Brien*, 99 N.M. at 641, 662 P.2d at 642. "If ambiguities cannot be resolved by examining the language of the insurance policy, courts may look to extrinsic evidence such as the premiums paid for insurance coverage, the circumstances surrounding the agreement, the conduct of the parties, and oral expressions of the parties' intentions. *Rummel*, 1997-NMSC-041, ¶ 21, 123 N.M. 752. Although ambiguities will generally be construed against the insurer, courts must adopt the interpretation that is most in accord with reason and the probable expectations of the parties.

*Id.* at ¶ 22, 123 N.M. 752.  Policies that are not ambiguous and do not contravene public policy must be enforced as written.  *O'Brien*, 99 N.M. at 641, 662 P.2d at 642.

Based on the above principles, this Court must first look at the usual and natural meaning of the term "agent" to determine what a reasonable lay person might understand the policy to mean.  *See Rummel*, 1997-NMSC-041, ¶ 19, 123 N.M. 752.  This Court will look to the dictionary to determine the natural meaning of the term, rather than to a restatement of law.  *See Carmichael v. The Payment Center, Inc.*, 336 F.3d 636, 640 (7th Cir. 2003) (noting that ordinary or natural meaning may be supplied by a dictionary) (citing *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)); *Spingola v. Spingola*, 91 N.M. 737, 743, 580 P.2d 958, 964 (1978) (looking to lay dictionary to determine accepted lay meaning of term).  The Random House Unabridged Dictionary defines "agent" as "a person or business authorized to act on another's behalf."   Random House Unabridged Dictionary 38 (2d ed. 1993). Similarly, Black's Law Dictionary defines "agent" as "[a] person authorized by another (principal) to act for or in place of him; one intrusted with another's business."  Black's Law Dictionary 63 (6th ed. 1990).  The Court finds that this definition of agent is reasonable within the context of the Policy.

FMCC nevertheless attempts to create ambiguity in the term "agent" by arguing that the term has two meanings, only one of which encompasses an "independent contractor." FMCC contends that Coffman was an independent contractor, not FMCC's agent.  FMCC's argument, however, too narrowly restricts the definition of agent.  Here, the usual, lay dictionary definition of agent is one who is authorized to act on another's behalf.  The lay

16

definition does not make any distinction or exclusion regarding an independent contractor. Thus, this Court need not determine whether Coffman was an independent contractor in the first instance.  Rather, this Court must merely determine whether Coffman was "authorized to act on another's behalf."   The fact that the Restatement makes distinctions between the two terms is not controlling, as it is the non-legal, lay definition that this Court should use.

In any event, the Restatement does not conflict with a lay definition that includes an independent contractor within the meaning of "agent."   The Restatement defines "independent contractor" as "a person *who contracts with another to do something for him* but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.  *He may or may not be an agent*." Rest. (Second) of Agency § 2(3) (emphasis added).  The Restatement also provides that "[o]ne who contracts *to act on behalf of another* and subject to the other's control except with respect to his physical conduct *is an agent and also an independent contractor*."  *Id.* § 14N (emphasis added).  The lay definition of agent as one who is authorized to act on another's behalf thus may include an independent contractor.  Because an agent and independent contractor are not mutually exclusive under the Restatement, this Court finds no reason to depart from the lay definition of agent which is broad enough to include independent contractors so long as they are authorized to act on another's behalf.  *Cf. Barnhill v. Liberty Mutual Fire Ins.*, 129 F.Supp.2d 1192, 1201 (N.D. Ind. 2001) (in interpreting identical exclusion clause in endorsement, court noted that independent contractor was also lessor's agent).  This Court refuses to create an ambiguity where none

17

exists by making overly legalistic distinctions.

This interpretation of the term "agent" is consistent not only with the natural definition of "agent" but also with the circumstances surrounding the policy, the premiums paid for the policy, and public policy interests.  In construing a policy, "a court should not lose sight of the subject matter of the insurance contract."  *Reliance*, 763 S.2d at 453.  In this case, the named insured of Allstate's policy was the Marquez Surveying Co.  Compl., Ex. B at 4.  The policy was designed to provide liability coverage, among other things, to Marquez Surveying Co. arising out of its possession and use of the covered vehicles, including the F-250.  *See id.*, Ex. B at 5, 8, 16-17.  FMCC was included within the protections of the policy as an "additional insured" because of its status as the certificate holder/lessor of the vehicle.  *See id.*, Ex. B at 9-10, 29-30.  The policy provided coverage to the lessor as to its interest in the vehicle.  *See id.*, Ex. B at 30.  It is clear from the policy, however, that the intent of the parties was to protect Marquez Surveying Co. and FMCC from losses arising out of Marquez Surveying Co.'s use of the vehicle.  *See id.*, Ex. B at 16, 30.  Because Allstate was providing coverage resulting from Marquez Surveying Co.'s operation and use of the vehicle, Marquez Surveying Co. was responsible for the premium payments under the policy.  FMCC did not pay and was not liable for any of the premiums. *See id.*, Ex. B at 30 ("The lessor is not liable for payment of your premiums.").  The exclusion clause thus stated that Allstate would stop providing coverage whenever FMCC or its agent took possession of the vehicle, because at that point, FMCC or its agent would have cut off Marquez Surveying Co.'s possession and use of the vehicle, which was the focal

18

point of the coverage in the policy.

FMCC's restrictive definition of "agent" that would exclude an independent contractor who was authorized to act on behalf of FMCC is unreasonable because it would mean that the lessee of the vehicle would bear the risk of the independent contractor's possession and use of the vehicle.  Presumably, for an insurance company to cover the risk associated with repossession of a vehicle by an independent contractor, the insurance company would impose higher premiums.  It is unreasonable for this risk, and potential increased premium, to be borne by the lessee whose use and possession of the vehicle have been cut off by the independent contractor acting on FMCC's behalf in repossessing the vehicle.[5]  It is clear from the policy, read as a whole, that the parties could not reasonably have intended such a result.  *Cf. Grisham v. Allstate Ins. Co.*, 1999-NMCA-153, ¶ 7, 128 N.M. 340, 342 ("Lack of control increases risk to the owner's insurer, a risk that is neither included in the policy nor calculated in the premium charged to the owner. . . . Accordingly, once the independent automobile business assumes control over the vehicle, it is reasonable

_____

[5]That FMCC would have understood that any such risk would be borne by the lessor or the persons acting on the lessor's behalf in repossessing the vehicle is also supported by the fact that  FMCC's Independent Contractor Agreement with GWR had an insurance clause that provided that GWR must have insurance policies to protect against damages resulting from actions by GWR in carrying out repossessions.  *See* Def.'s Resp., Ex. 4A at ¶ 4.  The agreement also had an indemnification clause, which provided:  "At Creditor's request, Contractor will defend all claims (including lawsuits, administrative claims, and other proceedings to cover personal injury or death, property damage or economic losses) that are related in any way to Creditor's, Contractor's or subcontractor's performance or obligations under this Agreement." Def.'s Resp., Ex. 4A at ¶ 6(a).  Although certainly not dispositive, the agreement indicates that FMCC would have understood that it or persons acting on its behalf would bear the risk of wrongful actions occurring during repossessions and repossession attempts.

that the business, and not the owner, bear the cost of insuring for such risks under its own liability policy."). Moreover, public policy supports the secured creditor and the persons, including independent contractors, acting on its behalf bearing the risks associated with repossession, because in bearing the risk, the secured creditor and persons acting on its behalf would presumably take greater care in conducting repossessions. Accordingly, this Court determines that the definition of agent as a person, including an independent contractor, who is "authorized to act on another's behalf" is more in accord with reason, the language of the policy as a whole, the probable expectations of the parties, and public policy.

This Court must thus determine whether GWR, Seibert, and Coffman fit within this meaning of the term "agent." It is undisputed that FMCC directly authorized GWR to act for it in accomplishing the repossession of the F-250. On July 18, 2002, FMCC reassigned the Marquez Surveying repossession to GWR with instructions, "Bankruptcy dismissed. Repo on sight." GWR was thus clearly FMCC's agent. GWR, in turn, assigned the repossession to Seibert, with whom GWR had a service agreement to conduct repossession work as GWR in the Albuquerque area. As discussed previously, Seibert, in his repossession work, worked under GWR's license as "Great Western Recovery, Albuquerque Branch." GWR also provided Seibert with GWR's name, bond, business and liability insurance for repossession services, client base, and a legal defense, if necessary. Moreover, GWR was to provide Seibert with repossession training as needed. GWR considered Seibert's office to be GWR's office in Albuquerque. Seibert conducted all GWR's Albuquerque repossessions. Additionally, FMCC employees knew that Seibert conducted GWR

repossessions and ran GWR's Albuquerque office. Based on these facts, this Court

concludes that Seibert's repossession business was GWR in Albuquerque. Consequently,

by authorizing GWR to conduct the Albuquerque repossession, FMCC authorized Seibert's

office to perform the repossession.

Furthermore, in performing the repossession on Seibert's office's request, Coffman

acted as GWR. As discussed above, Coffman worked out of GWR's Albuquerque office and

under GWR's name, license, and insurance when doing repossession work, including the

repossession at issue here. Neither GWR, Seibert, or Coffman had a security interest in the

vehicle, and the actions taken to repossess the vehicle were based solely on FMCC's

assignment and directive to repossess the vehicle on sight. Seibert and Coffman were plainly

performing the repossession on behalf of FMCC and pursuant to FMCC's authorization to

GWR. Based on these facts, Coffman had been authorized to act on FMCC's behalf to

repossess the vehicle.[6] Whether or not Coffman is classified as an "independent contractor"

---

[6]FMCC contends that it did not authorize Coffman to repossess the vehicle because its
Independent Contractor Agreement did not permit GWR to subcontract repossession assignments
in the manner that it did. Def.'s Resp. at 11. The ICA provided that GWR could delegate its
duties to subcontractors only if the subcontractor was licensed, had insurance, and entered into an
independent contractor agreement with FMCC. Def.'s Resp., Ex. 4A. There is, however, a
factual and legal dispute as to whether the ICA, including this provision, were in force at the time,
since there is evidence that FMCC terminated the ICA prior to the reassignment of the
repossession at issue here. Nevertheless, even assuming that the ICA's provisions were in force,
this Court finds that the provision does not negate this Court's finding that FMCC had authorized
GWR, Seibert, and Coffman to act on its behalf. As just discussed, both Seibert and Coffman
were acting as GWR in performing the repossession and were acting under GWR's license, bonds,
and insurance. Moreover, FMCC knew that Seibert had performed numerous repossessions as
GWR on FMCC's behalf and that Seibert was GWR's representative in Albuquerque. Thus, in
reassigning the Albuquerque repossession of the F-250 to GWR, FMCC implicitly authorized
persons acting as GWR, including Seibert and Coffman, to act on FMCC's behalf.

does not change the fact that a reasonable lay person would understand that Coffman, in attempting to repossess the F-250 on behalf of FMCC and according to its assignment of the repossession to GWR, was an "agent" of FMCC for purposes of the Policy. This interpretation is consistent with the treatment of repossession by New Mexico law as well as by the state court in *Marquez*, which held that FMCC cannot avoid liability by using an independent contractor to accomplish the repossession. *Cf. Reliance*, 763 So.2d at 453-54. Therefore, this Court determines that Coffman was authorized to act on FMCC's behalf in repossessing the vehicle, and therefore, Coffman was an agent of FMCC within the meaning of the Policy.

### C.   Coffman had "possession" of the F-250

The Policy exclusion does not apply unless Coffman also had taken "possession" of the vehicle. FMCC contends that "possession" is ambiguous because there are different stages in the repossession process at which the repossession contractor could be considered to have acquired possession of the vehicle. FMCC identifies four stages of possession of a repossessed vehicle: (1) delivery of the vehicle by the contractor to the auto auction; (2) transmittal to FMCC by the contractor of a completed vehicle condition report stating that the repossession had been accomplished; (3) arrival of the vehicle at the contractor's secured storage site; or (4) departure of the contractor from the debtor's premises and arrival onto a public roadway with the repossessed vehicle. Def.'s Resp. at 16-17. FMCC argues that these different stages of repossession demonstrate that the term "possession" as used in the policy is ambiguous. This Court rejects FMCC's attempt to create ambiguity in the policy

language by equating the term "possession" with the legal construct "repossession."

As discussed above, to determine whether a provision is reasonably subject to competing interpretations, the court must ask what a reasonably intelligent, non-lawyer lay person might understand the policy to mean, in light of the usual and natural meaning of words and the circumstances prior to and in making the policy. *Berry*, 2002-NMCA-116, ¶ 61, 136 N.M. 454; *Rummel*, 1997-NMSC-041, ¶ 19, 123 N.M. 752. This Court will thus look first to the dictionary definition of "possession" to determine if an ambiguity exists. The Random House Unabridged Dictionary defines "possession" as "actual holding or occupancy, either with or without rights of ownership." Random House Unabridged Dictionary 1509 (2d ed. 1993). According to Black's Law Dictionary, "possession" means "[h]aving control over a thing with the intent to have and to exercise such control." Black's Law Dictionary 1163 (6th ed. 1990). It further defines "actual possession" as existing "where the thing is in the immediate occupancy and physical control of the party." *Id.*

Based on these definitions, it is clear that Coffman had possession of the vehicle. It is undisputed that Coffman entered the Marquez Surveying Co.'s property, got into the F-250, and began driving away. In driving the vehicle, Coffman exercised manual, physical control over the truck. *Cf. State v. Greyeyes*, 105 N.M. 549, 552, 734 P.2d 789, 792 (Ct. App. 1987) (being in control of vehicle is "synonymous with driving the vehicle for purposes of the DWI statute"). In occupying and physically controlling the vehicle, Coffman possessed the vehicle within the meaning of the Policy. Whether or not Coffman was on public or private property is irrelevant to whether he held, occupied, or physically controlled

the vehicle, and thus, irrelevant to whether he possessed the vehicle within the meaning of the Policy.

FMCC's resort to cases involving when a "repossession" is complete for purposes of determining whether a repossessor breached the peace is unavailing. "Repossession" is a technical legal term, and as such, its meaning does not comport with what a lay person would understand the term "possession" to mean. The term "repossession" is not the term used in the Policy. The lay meaning of "possession" is what is relevant. Consequently, cases involving when a repossession is legally complete are inapposite.

Furthermore, the definition of "possession" as "actual holding or occupancy, either with or without rights of ownership" is reasonable and in accord with public policy. When Coffman occupied the vehicle and began driving away, he exercised physical control over the vehicle and thus cut off the lessee's control and use of the vehicle. In these circumstances, it is therefore reasonable that the lessee should not bear the risk of Coffman's actions taken on behalf of FMCC. *Cf. Grisham v. Allstate Ins. Co.*, 1999-NMCA-153 at ¶ 7, 128 N.M. at 342. Accordingly, Coffman "possessed" the F-250 within the meaning of the policy at the time he occupied and began driving the truck.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, this Court concludes that Coffman constituted FMCC or FMCC's "agent" and was in "possession" of the F-250 within the meaning of the Policy. Consequently, coverage under the Policy terminated according to the exclusion provision when Coffman began driving the F-250 prior to the collision with John Marquez. This Court

therefore concludes that Allstate is entitled to summary judgment on Count 1 of its complaint.  Based on this determination, FMCC's motion for partial summary judgment on the portion of their counterclaim requesting a declaratory judgment that Allstate had a duty to defend and indemnify FMCC in the *Marquez* action must necessarily be denied.

**IT IS THEREFORE ORDERED** that:

1.     ***Plaintiff's Motion for Summary Judgment*** (**Doc. No. 29**) is hereby **GRANTED**; and

2.     ***Defendant's Motion for Partial Summary Judgment*** (**Doc. No. 34**) is hereby **DENIED**.

**SO ORDERED** this 24th day of February, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

25